GORDON & SILVER, LTD.
THOMAS H. FELL, ESQ.
Nevada Bar No. 3717
MATTHEW C. ZIRZOW, ESQ.
Nevada Bar No. 7222
3960 Howard Hughes Pkwy, 9th Fl.
Las Vegas, Nevada 89109
Telephone: (702) 796-5555
Facsimile: (702) 369-2666
E-mail: mcz@gordonsilver.com

Attorneys for Tamura Corporation of America

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

In re                                                    Case No.: BK-S-01-13513-LBR

WILLIAM H. DULL and JENNY K. DULL,                       Chapter 13

          Debtors.                                       Date:  October 22, 2001
_____/               Time:  1:30 p.m.

### TRIAL BRIEF OF TAMURA CORPORATION OF AMERICA
### RE: OBJECTION TO CONFIRMATION OF CHAPTER 13 PLAN,
### AND MOTION TO CONVERT CHAPTER 13 CASE TO CHAPTER 7

Tamura Corporation of America, a California corporation ("TCA"), by and through its

counsel, the law firm of Gordon & Silver, Ltd., hereby submits its Trial Brief Re: Objection To

Confirmation of Chapter 13 Plan, and Motion to Convert Chapter 13 Case to Chapter 7 (the "Trial

Brief") in the above-referenced matter.

### I.
### INTRODUCTION

The evidence will show that the Chapter 13 Plan of William H. Dull ("Dull") and Jenny K.

Dull ("Mrs. Dull" and, together with Dull, the "Debtors") has not been proposed in good faith as

required by 11 U.S.C. § 1325(a)(3).  The evidence will show that Debtors' prepetition conduct

toward TCA was reprehensible, that Debtors' bankruptcy filing was primarily motivated to defeat

an arbitration proceeding commenced by TCA against Dull prior to the bankruptcy, that Debtors'

selection of Chapter 13 was to seek a superdischarge of otherwise nondischargeable debts to TCA,

that Debtors' have engaged in a pattern of delay and stonewalling TCA's efforts to establish its

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY.
LAS VEGAS, NEVADA 89109
(702) 796-5555



claims, and that Debtors have otherwise acted inequitably such that confirmation of their Chapter 13 Plan should be denied.

The evidence will also show that sufficient bad faith exists to warrant conversion of Debtors' Chapter 13 case to Chapter 7 pursuant to 11 U.S.C. § 1307(c). The evidence will show that Debtors have misrepresented facts in their filings before this Court, that Debtors' bankruptcy filing is an attempt to unfairly manipulate the Bankruptcy Code, and that otherwise egregious behavior is present such that conversion of their case to Chapter 7 is warranted.

## II.
## STATEMENT OF FACTS

**A.    While Working As An Officer And Director Of TCA, Dull Caused TCA To Pay For More Than $1,800,000.00 In Unauthorized Personal Expenses On His Behalf.**

1.    Dull served as CEO and Director of TCA from 1986 to July 1998, and served as a salaried advisor with TCA from August 1998 to April 1999. In these capacities, Dull retained control over TCA's financial affairs until late 1998.

2.    While serving in the foregoing capacities, Dull caused TCA to pay for more than $1,817,634.00 in unauthorized personal expenses on his behalf. Because Dull was CEO of TCA, the expenses he submitted for reimbursement were never openly challenged by TCA's employees, and Dull took many steps to disguise his unauthorized expenses to make them appear as legitimate business expenses to TCA's parent corporation in Japan.

3.    Dull's normal procedure for obtained reimbursements of unauthorized personal expenses from TCA was the same procedure that he followed for obtaining reimbursements for legitimate business expenses. Specifically, Dull produced receipts with a brief notation or oral explanation as to why TCA should pay for them as a business expense. The receipts would then be taken to accounts payable personnel, and these personnel were instructed to process the receipts per Dull's direction.

4.    The bulk of Dull's unauthorized personal expenses were incurred on his or Mrs. Dull's personal credit cards, which Dull caused TCA to pay for by check directly to Dull's credit card companies. Dull's other unauthorized personal expenses paid by TCA were billed by the creditor directly to Dull, and then Dull would cause TCA to pay the creditor by check.

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89109
(702) 796-5555

5.      Dull's unauthorized personal expenses included, but were not limited to, the following: $34,906.76 in fraudulent room charges at the Las Vegas Hilton that actually went to cover gambling and other personal expenses; $51,531.34 in collector's toy trains; $66,309.15 for a down payment on real estate in Nevada; $237,415.57 in vacation and travel expenses; $42,176.16 in golf and country club expenses; $241,723.51 in clothing expenses; $49,349.11 for a wine collection; $237,646.38 in jewelry; $11,593.26 for an extravagant birthday dinner party; $70,894.72 in plastic surgery and acupuncture; $29,082.00 in artwork; $33,422.00 in wages for a housekeeper; $20,797.00 in wages for a gardener; $27,761.34 for luxury automobiles and repairs; $103,888.34 in cosmetics, pet supplies, groceries and other miscellaneous items; $180,921.23 in home furnishings; $49,820.27 in personal entertainment expenses; $54,601.25 in political contributions; and $273,795.08 as a salary for Mrs. Dull.

**B.      While Working As An Officer And Director Of TCA, Dull Formed Several Nevada Corporations To Divert Business Away From TCA.**

6.      In 1997, Dull, along with Stephen Lagomarsino ("Lagomarsino"), Jerome Potash ("Potash"), and Mario Nicoletti ("Nicoletti"), formed two (2) Nevada corporations, which were to serve as a distributor and manufacturer for TCA's parts.   The distributor was named AALTAM aka TRC West, Inc. ("TRC West"), and the manufacturing company was named Microtran Manufacturing, Inc. aka TRC Manufacturing, Inc. ("TMI").

7.      Lagomarsino served as the president of both TRC West and TMI, Nicoletti served as the vice-president and treasurer of both, and Potash served as the secretary of both.  Although Dull did not have any formal title or position with TRC West or TMI, he controlled virtually every activity of these corporations behind the scenes, and used Nicoletti, a TCA employee, to carry out his orders with respect to these corporations.  Dull also had the power to sign and endorse checks on behalf of TRC West and TMI, and had the power to deposit and withdraw money from their accounts.

8.      On June 30, 1998, Dull caused TCA to enter into a Subcontract Relationship and Turnkey Asset Sale Agreement (the "Subcontract Agreement") with TMI, while, at the same time, instructing Nicoletti to negotiate the Subcontract Agreement on behalf of TMI.  Under the Subcontract Agreement, TMI was to assemble and manufacture all electronic products as a

GORDON & SILVER, LTD.
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89109
(702) 796-5555

G:\DATA\BNKRPTCY\04897.001\pldgs-Dull\10.01\Trial Brief.doc

3

1    subcontractor for TCA.    TCA loaned to TMI engineering drawings and requirements to

2    manufacture these parts, and sold to TMI various assets and equipment for TMI's business.    The

3    Subcontract Agreement also transferred Nicoletti to TMI's employ.

4        9.    While the Subcontract Agreement authorized TMI to manufacture parts only as a

5    subcontractor of TCA, Dull used TRC West to become the master distributor for all of TCA's

6    products, thereby diverting TCA's business and customers to TRC West.

7        10.    In order to divert away TCA's business to his Nevada corporations, Dull did the

8    following:

9            a.    Caused representatives from TCA, including but not limited to

10    Lagomarsino, to inform TCA's customers that TCA had established TRC West as its distribution

11    center;

12            b.    Caused employees of TMI to attend training seminars at TCA to learn

13    TCA's computer systems and product line;

14            c.    Provided TMI with engineering samples of almost every TCA part;

15            d.    Caused TMI to manufacture TCA parts using TCA engineering drawings

16    and test specifications;

17            e.    Caused TMI to buy parts from TCA's distributors in order to manufacture

18    parts similar to TCA; and

19            f.    Used TCA's customer lists and pricing lists to help TMI and TRC West

20    divert customers away from TCA.

21        11.    In approximately December 1998, Dull caused Potash to negotiate the purchase of

22    Thordarson-Meissner, which was a transformer manufacturing company located in Mount

23    Carmel, Illinois, and which has been incorporated in Nevada under the name AALMAG, Inc.,

24    a.k.a. Thordarson ("Thordarson").

25        12.    At Dull's direction, TMI shipped several boxes filled with engineering drawings

26    and test specifications from TCA to Thordarson.    Dull also caused to be shipped to Thordarson

27    various office equipment and a TMI computer system which contained extensive TCA customer

28    information.    Dull also caused employees to copy and redraw TCA engineering drawings as

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89109
(702) 796-5555

property of Thordarson.

G:\DATA\BNKRPTCY\04897.001\pldgs-Dull\10.01\Trial Brief.doc

13.    Dull has claimed that he is currently an unpaid advisor for Thordarson, but expects to receive a salary from them in the years to come as the business grows. Mrs. Dull has testified that she is employed by Thordarson as a sales associate earning a $24,000 per year by representing Thordarson at trade shows.

**C.    TCA's Arbitration Proceeding Against Mr. Dull, And The Intervening Bankruptcies Of TRC West And TMI.**

14.    When TCA learned of the diversion of TCA's customers to TRC West, it did not know immediately that it was Dull who was primarily responsible for this diversion.  On December 18, 1998, TCA's parent company sent a letter to TCA's customers telling them that they had been misinformed, and that TCA had not established TRC West as its distribution center, and that TRC West was not related in any way to TCA.

15.    A series of negotiations ensued in which Dull was involved on both sides of the table.  Dull participated on behalf of TCA, and behind the scenes, without the knowledge of TCA's parent company, he would draft memoranda and correspondence to be signed by someone at TRC West or TMI and sent to TCA.

16.    After learning of Dull's activities and misappropriations, on or about April 25, 2000, TCA commenced an arbitration proceeding with the American Arbitration Association, being styled <u>Tamura Corporation of America v. William H. Dull</u>, Case No. 72-160-00425-00 VSI (the "Arbitration") in Los Angeles, California.  TCA's Arbitration asserted claims against Dull for fraud, constructive fraud, conversion, intentional interference with prospective economic advantage, unfair business practices, breach of fiduciary duty, and unjust enrichment.

17.    TCA subpoenaed TMI and TRC West for depositions in the Arbitration, which were originally set to proceed on January 4 and 5, 2001.  After the corporations requested a brief extension of the date for the depositions, and refused to reschedule them, TCA brought a motion to compel the depositions and the deposition of Nicoletti, the president of both corporations, in the Eighth Judicial District Court, Clark County, Nevada, being Case No. 00-A-428361-C (the "State Court Action").  The hearing on the motion to compel was set for March 8, 2001, however, on March 7, 2001, TMI and TRC West filed their voluntary Chapter 7 petitions in the

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89109
(702) 796-5555

G:\DATA\BNKRPTCY\04897.001\pldgs-Dull\10.01\Trial Brief.doc

5

1    U.S. Bankruptcy Court for the District of Nevada, being Case Nos. 01-11936-RCJ and 01-

2    11940-LBR, respectively.

3        18.    On March 20, 2001, TCA took the depositions of Dull and Mrs. Dull in the

4    Arbitration. Dull and Mrs. Dull both plead the Fifth Amendment in response to all substantive

5    questions directed to them, including but not limited to questions regarding the fraudulent

6    personal expense reimbursements they received from TCA, and Dull's substantial involvement

7    with TRC West and TMI. Dull and Mrs. Dull's counsel indicated that their assertions of the

8    Fifth Amendment were based on a pending criminal investigation by the Internal Revenue

9    Service ("IRS").

10   **D.    The Dulls' Bankruptcy Filing.**

11       19.    Undoubtedly recognizing that he did not have a chance of prevailing in the

12   Arbitration, on April 16, 2001, the day before critical matters were set to proceed in the

13   Arbitration, Dull and Mrs. Dull (the "Debtors") filed their joint Chapter 13 petition.

14       20.    On June 1, 2001, Debtors filed their Schedules (the "Schedules") and Statement

15   of Financial Affairs (the "Statement"), along with their Chapter 13 Plan (the "Plan"). Debtors'

16   Schedules did not even list TCA as a creditor. Debtors' Statement, Item 14: Property Held for

17   Another Person, did indicate, however, that Debtors are holding an estimated $3,000 worth of

18   property for TCA, and also indicated the existence of the Arbitration.

19       21.    On June 11, 2001, TCA filed its proof of claim in the amount of $1,817,634,

20   representing the unauthorized personal expenses Debtors caused TCA to pay.

21       22.    On July 27, 2001, Debtors appeared at their 341 Meeting, wherein they repeatedly

22   refused to answer questions, and made baseless assertions of the attorney-client privilege.

23       23.    TCA thereafter objected to confirmation of Debtors' Chapter 13 Plan, and sought

24   to have Debtors' bankruptcy case converted to Chapter 7.

25       24.    On or about August 15, 2001, TCA served Debtors' counsel with: (a) an

26   Amended Notice of Taking Deposition of Jenny K. Dull; Request for Production of Documents,

27   and (b) a Notice of Taking Deposition of William H. Dull; Request for Production of Documents

28   (collectively, the "Document Requests").

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89109
(702) 796-5555

G:\DATA\BNKRPTCY\04897.001\pldgs-Dull\10.01\Trial Brief.doc

6

25.     On September 21, 2001, Debtors filed their Response to Tamura Corporation of America's Request for Production of Documents (the "Debtors' Response"). Debtors' Response indicated that Debtors were refusing to turn over the bulk of the documents request by TCA, and raised the following objections thereto:

a.      The requested documents are not relevant to whether Debtors' Chapter 13 Plan was proposed in good faith, or whether Debtors' Chapter 13 case should be converted to Chapter 7.

b.      The requested documents are subject to Debtors' Fifth Amendment privilege against self incrimination, the parallel protection against self-incrimination in the California state constitution, and other evidentiary objections.

26.     On September 24, 2001, TCA took the deposition of Dull, wherein he asserted the aforementioned objections and privileges to all questions regarding the factual assertions contained in eight (8) declarations (the "Declarations") from the Arbitration, among other matters.[1]  The Declarations contain a detailed explanation of Dull's fraudulent personal expense reimbursements from TCA, as well as his involvement in setting up the two Nevada corporations to divert business away from TCA.  Dull's assertion of his privilege against self incrimination was again predicated upon the alleged criminal investigation by the IRS in California.

27.     On September 28, 2001, TCA took the deposition of Mrs. Dull, wherein she also made the same objections and assertions of privilege as Dull, and refused to discuss any of the factual matters set forth in the Declarations, among other matters.

28.     On October 10, 2001, Debtors produced certain account statements for their six (6) insurance policies and four (4) pension plans, but failed to provide any indication why the documents were not produced previously pursuant to TCA's Document Request.  Debtors' production of these documents after their depositions prevented TCA from questioning Debtors regarding the documents.

29.     On October 16, 2001, Debtors produced certain bank account statements for Debtors' various bank accounts, but again failed to any indication why the foregoing documents

---

[1] Specifically, Dull refused to answer questions regarding the factual assertions in the Declarations of Norman Michelson, David Williams, Doug Henderson, Steve Manning, Stephen Lagomarsino, Jerome Potash, Michael H. Kirk and Edward Lord (collectively, the "Declarations").

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89109
(702) 796-5555

G:\DATA\BNKRPTCY\04897.001\pldgs-Dull-10.01\Trial Brief.doc

1    were not produced previously pursuant to TCA's Document Requests.    Again, Debtors'

2    production of these documents after their depositions prevented TCA from questioning Debtors

3    regarding the documents.

### III.
### LEGAL ARGUMENT

6    **A.**    **Objection To Confirmation Pursuant To 11 U.S.C. § 1325(a)(3).**

7        **1.**    **A Chapter 13 Plan Must Be Proposed In Good Faith Pursuant to 11 U.S.C. §**
             **1325(a)(3).**

9    Subsection 1325(a)(3) of the Bankruptcy Code provides the following:

10           (a)    Except as provided in subsection (b), the court shall
             confirm a plan if –

             . . .

                     (3)    the plan has been proposed in good faith and not by
                     any means forbidden by law; . . .

13    11 U.S.C. § 1325(a)(3).

14        Subsection 1325(a)(3) of the Bankruptcy Code provides that in order to confirm a

15    Chapter 13 plan, the court must find that the plan has been proposed in good faith.  "Good faith"

16    is not statutorily defined.  See Goeb v. Heid (In re Goeb), 675 F.2d 1386, 1389-90 (9th Cir.

17    1982).  Instead, a bankruptcy court must make a factual determination of whether a plan has been

18    proposed in good faith based on the totality of the circumstances and on a case-by-case basis.

19    See id. at 1390-91; 550 West In Road Trust v. Tucker (In re Tucker), 989 F.2d 328, 300 (9th Cir.

20    1993); Smyrnos v. Padilla (In re Padilla), 213 B.R. 349, 352 (B.A.P. 9th Cir. 1997).

21        The debtor has the burden of establishing that a Chapter 13 Plan is proposed in good

22    faith.  See Padilla, 213 B.R. at 352; In re Dickerson, 232 B.R. 894, 897 (Bankr. E.D. Tex. 1999).

23    The bankruptcy court may consider the following non-exhaustive list of factors in determining

24    whether a debtor is proposing a Chapter 13 plan in good faith:

25           1.    The amount of the proposed payments and the amounts of
             the debtor's surplus;

27           2.    The debtor's employment history, ability to earn, and
             likelihood of future increases in income;

             3.    The probable or expected duration of the plan;

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89109
(702) 796-5555

G:\DATA\BNKRPTCY\04897.001\pldgs-Dull\10.01\Trial Brief.doc

4.      The accuracy of the plan's statements of the debts, expenses and percentage of repayment of unsecured debt, and whether any inaccuracies are an attempt to mislead the court;

5.      The extent of preferential treatment between classes of creditors;

6.      The extent to which secured claims are modified;

7.      The type of debt sought to be discharged, and whether any such debt is nondischargeable in Chapter 7;

8.      The existence of special circumstances such as inordinate medical expenses;

9.      The frequency with which the debtor has sought relief under the Bankruptcy Reform Act;

10.     The motivation and sincerity of the debtor in seeking Chapter 13 relief; and

11.     The burden which the plan's administration would place upon the trustee.

See Smyrnos v. Padilla (In re Padilla), 213 B.R. 349, 352-53 (B.A.P. 9th Cir. 1997). The bankruptcy court may also taken into consideration prepetition conduct in deciding whether the debtor has "acted equitably." See Tucker, 989 F.2d at 330 (citing Goeb, 675 F.2d at 1390).

**2.      Debtors' Chapter 13 Plan Is Not Proposed In Good Faith.**

**a.      Debtors' Prepetition Conduct.**

Prior to filing for bankruptcy, Dull engaged in a systematic scheme to defraud TCA, not only through false claims for personal expense reimbursements, but also by establishing several Nevada corporations to divert business away from TCA, all while continuing to serve as an officer and director of TCA. When TCA finally learned of Dull's conduct, and was able to depose him in the Arbitration, Dull asserted his Fifth Amendment privilege to nearly every question asked of him.

The day before critical matters were set to proceed in the Arbitration, Debtors filed their Chapter 13 bankruptcy petition. Debtors' bankruptcy filing was clearly calculated to defeat the Arbitration, and to prevent TCA from liquidating its claim in that proceeding. The timing of Debtors' bankruptcy filing allowed them to qualify for Chapter 13 relief, whereas had TCA been able to liquidate its claim in the Arbitration, then Debtors would not have been able to meet the

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89109
(702) 796-5555

G:\DATA\BNKRPTCY\04897.001\pldgs-Dull\10.01\Trial Brief.doc

9

debt eligibility limits for Chapter 13 in Subsection 109(e) of the Bankruptcy Code.

           **b.**       **Debtors Filed For Chapter 13 Primarily To Seek A Superdischarge Of Otherwise Nondischargeable Debts.**

Debtors are attempting to take advantage of the superdischarge pursuant to Subsection 1328(a) of the Bankruptcy Code to discharge debts that would otherwise be nondischargeable pursuant to Subsection 523(a) of the Bankruptcy Code in a Chapter 7 proceeding.[2] Debtors' burden to show that their Chapter 13 Plan was proposed in good faith is "particularly heavy" when a superdischarge is sought. See Padilla, 213 B.R. at 352 (citing In re Warren, 89 B.R. 87 (B.A.P. 9th Cir. 1988)).

A debtor who seeks to use Chapter 13 for the express purpose of discharging otherwise nondischargeable debts has acted in bad faith for purposes of Subsection 1325(a)(3) of the Bankruptcy Code. See Handeen v. LeMaire (In re LeMaire), 898 F.2d 1346 (8th Cir. 1990) (en banc); State of Ohio, Student Loan Comm'n v. Doersam (In re Doersam), 849 F.2d 237, 239-40 (6th Cir. 1988) (stating that "whether the debt would be nondischargeable under Chapter 7 is a factor which is relevant to the determination of good faith."); In re Schaitz, 913 F.2d 451 (7th Cir. 1990); Pioneer Bank of Longhart v. Rasmusen (In re Rasmusen), 888 F.2d 703 (10th Cir. 1989); In re Smith, 848 F.2d 813 (7th Cir. 1988); Neufeld v. Freeman, 794 F.2d 149 (4th Cir. 1986), on remand 66 B.R. 610 (Bankr. W.D. Va. 1986).

The totality of the circumstances indicates that Debtors' purpose in filing for bankruptcy and, in particular, their selection of Chapter 13, was primarily motivated to seek a superdischarge of these otherwise nondischargeable debts. Debtors have attempted to camouflage their filing as motivated by their alleged tax problems, however, when considering that Debtors' tax liabilities pale in comparison to the amount of TCA's claim, Debtors' claimed motivation is clearly transparent. In addition, the timing of Debtors' bankruptcy filing, and Debtors' pattern of interference and delay, highlights Debtors' bad faith use of Chapter 13.

---

[2] Debtors' debts to TCA would be nondischargeable in a Chapter 7 proceeding pursuant to at least Subsection 523(a)(2) of the Bankruptcy Code for money, property or services obtained by false pretenses, false representations or actual fraud, and pursuant to Subsection 523(a)(4) of the Bankruptcy Code for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89109
(702) 796-5555

G:\DATA\BNKRPTCY\04897.001\pldgs-Dull\10.01\Trial Brief.doc

**c.**      **Debtors' Conduct In Their Bankruptcy Case.**

Now in bankruptcy, Debtors have continued to delay and stonewall TCA's attempts to bring Debtors' financial affairs to light.  At their 341 Meeting, Debtors made baseless assertions of the attorney-client privilege and otherwise refused to answer questions regarding the origination or disposition of specific assets.  When TCA took their depositions, Debtors continued to assert their Fifth Amendment privilege and refused to answer any questions regarding both their prepetition conduct and significant assets of their estate.

**3.**      **Debtors' Assertion Of Their Fifth Amendment Privilege Against Self Incrimination.**

Debtors are apparently seeking sympathy because there is a pending criminal investigation against them by the IRS, which investigation Debtors blame on TCA.  TCA submits that any involvement it may or may not have had in referring any matters to the U.S. Attorney's Office or the IRS is simply irrelevant to the present proceedings.  In addition, TCA submits that such offices would probably not devote their limited resources to conducting such an investigation unless they had sufficient, credible information of possible criminal violations by Debtors.  Debtors have no one to blame for their troubles with the IRS except themselves.

Debtors claim that they asserted their Fifth Amendment privilege in the Arbitration, and again at the depositions in their bankruptcy case, because of the danger that their statements could be used against them in a possible criminal case for their alleged tax problems.  Moreover, Debtors apparently will continue to remain silent and assert their Fifth Amendment privilege in their bankruptcy case.  Although TCA recognizes that Debtors have a Fifth Amendment privilege, and that Debtors retain this privilege in their bankruptcy case, Debtors must recognize that their reliance on the privilege carries negative consequences for them in their bankruptcy case.

**a.**      **Failure Of Proof On Matters That Debtors Have The Burden Of Proof.**

First, "[a] debtor or other party that relies on a claim of Fifth Amendment privilege may find that the result is a failure of proof on some matter as to which the party bears the burden of proof or of going forward."  3 Collier on Bankruptcy ¶ 344.04[4] (15th ed. 2001); United States

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89109
(702) 796-5555

G:\DATA\BNKRPTCY\04897.001\pldgs-Dull\10.01\Trial Brief.doc

1  v. Talco Contractors., Inc., 153 F.R.D. 501, 509 (W.D.N.Y. 1994) (refusing to grant a

2  defendant's motion seeking a stay of a civil tax action, and holding that "[a] party who asserts

3  the privilege against self-incrimination must bear the consequence of lack of evidence").

4  As previously noted, Debtors have the burden of establishing that their Chapter 13 Plan

5  was proposed in good faith pursuant to Subsection 1325(a)(3) of the Bankruptcy Code.  See

6  Smyrnos v. Padilla (In re Padilla), 213 B.R. 349, 352 (B.A.P. 9th Cir. 1997); In re Dickerson, 232

7  B.R. 894, 897 (Bankr. E.D. Tex. 1999).  Debtors stonewalling, especially in the face of TCA's

8  substantial evidence of Debtors' bad faith, is simply a failure of proof on Debtor's part that their

9  Chapter 13 plan was proposed in good faith.

10  **b.    Drawing Of Adverse Inferences.**

11  Second, courts may draw an "adverse inference" against a party for relying on the privilege.

12  See 3 Collier on Bankruptcy ¶ 344.04[3] (15th ed. 2001) (citing Mitchell v. United States, 526 U.S.

13  314, 328 (1999); Baxter v. Palmigiano, 425 U.S. 308, 316-320 (1976)).  Thus, bankruptcy courts

14  may draw an adverse inference from an individual's silence following a claim of privilege.  See,

15  e.g., Grossman v. Murray, 162 B.R. 384 (Bankr. D. Mass 1993); General Motors Acceptance Corp.

16  v. Bartlett (In re Bartlett), 154 B.R. 827 (Bankr. D.N.H. 1993); Charter Fed. Sav. Ass'n v. Rezak (In

17  re Lederman), 140 B.R. 49 (Bankr. E.D.N.Y. 1992); Raymond James & Assoc. v. Metzgar (In re

18  Metzgar), 127 B.R. 708 (Bankr. M.D. Fla. 1991); Marine Midland Bank, N.A. v. Endres (In re

19  Endres), 103 B.R. 49 (Bankr. N.D.N.Y. 1993).

20  Such an adverse inference "is permitted where [an individual] asserts his privilege on

21  matters peculiarly within his knowledge and where there is independent evidence supporting the

22  adverse fact being inferred."  Erie Materials, Inc. v. Oot (In re Oot), 112 B.R. 497, 501 (Bankr.

23  N.D.N.Y. 1989).  If the party asserting the Fifth Amendment remains silent in the face of facts

24  established by the other party, the bankruptcy court may infer that the debtor is unable to deny the

25  allegations.

26  TCA has put forth sufficient evidence such that the Court can and should draw the negative

27  inference against Debtors, and otherwise deem the allegations as true.  Furthermore, Debtors'

28  attempt to claim that their case is not "egregious" enough for the Court to draw such an adverse

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89109
(702) 796-5555

G:\DATA\BNKRPTCY\04897.001\pldgs-Dulll0.01\Trial Brief.doc

12

inference is without merit. Notwithstanding the fact that Debtors fail to cite any authority in support

of their "egregiousness" test, TCA has put forth sufficient quantum of evidence regarding Debtors'

conduct such that the drawing of an adverse inference is proper.

### 4. Debtors' Assertion Of A Privilege Against Self-Incrimination Pursuant To The California State Constitution.

Debtors also assert a privilege pursuant to Cal. Const. Art. I, Sec. 15, Cl. 6, which

provides, in pertinent part, the following:

> Persons may not twice be put in jeopardy for the same offense, be compelled in a criminal cause to be a witness against themselves, or be deprived of life, liberty, or property without due process of law.

Cal. Const. Art. I, Sec., Cl. 6.

First, it is unknown why Debtors claim a privilege pursuant to the California constitution

given that they have been Nevada residents for several years. Although Debtors did live in

California during some of the events giving rise to their potential criminal liability, and the

criminal investigation is being conducted by authorities in California, neither of these matters

allow them to claim the benefits of the California state constitution.

Notwithstanding the foregoing, even if Debtors could properly invoke the California state

constitution's privilege against self-incrimination, this provision merely parallels the Fifth

Amendment, such that the Court could still draw an adverse inference from Debtors' failures and

refusals to testify after asserting the privilege.

### 5. Debtors' Reliance On Cal. Evid. Code § 913(a) As Prohibiting The Drawing Of An Adverse Inference.

Debtors assert that the Court's drawing of an adverse inference is improper pursuant to

Cal. Evid. Code § 913(a). Debtors' reliance on California privilege rules in this context is

clearly misplaced, at least within the context of their bankruptcy case.

Fed. R. Evid. 101 provides that the Federal Rules of Evidence govern proceedings before

bankruptcy courts. Fed. R. Evid. 501 deals with privileges and provides as follows:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89109
(702) 796-5555

G:\DATA\BNKRPTCY\04897.001\pldgs-Dulli\10.01\Trial Brief.doc

13

may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

Fed. R. Evid. 501.

Debtors point to the last sentence in Fed. R. Evid. 501 and argue that "the cause of action arises under state law," and therefore, that California evidentiary rules should apply with respect to the privilege.

TCA submits that the "cause of action" herein are two contested matters in a federal bankruptcy proceeding: whether Debtors' Chapter 13 Plan is proposed in good faith pursuant to Subsection 1325(a)(3) of the Bankruptcy Code, and whether conversion of Debtors' Chapter 13 case to Chapter 7 is warranted pursuant to Subsection 1307(c) of the Bankruptcy Code. TCA fails to see how "State law supplies the rule of decision" per Fed. R. Evid. 501 such that the California evidentiary rules, and not the federal common law of privileges, should apply.

**B.      Motion To Convert Debtors' Case To Chapter 7 Pursuant To 11 U.S.C. § 1307(c).**

       **1.      Standard For Conversion Of A Chapter 13 Case To Chapter 7 Pursuant To 11 U.S.C. § 1307(c).**

Subsection 1307(c) of the Bankruptcy Code provides, in pertinent part, the following:

> (c)      Except as provided in subsection (e) of this section, on request of a party in interest or the United States trustee and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title, or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause, including . . .

11 U.S.C. § 1307(c).

Denial of confirmation of a plan, together with a denial of a request for additional time to file another plan or modification is cause to dismiss or convert a Chapter 13 case pursuant to Subsection 1307(c)(5) of the Bankruptcy Code. The enumerated examples of "cause" in Subsection 1307(c) of the Bankruptcy Code, however, are not exhaustive. See 11 U.S.C. § 102(3) (stating that the use of the word "including" in the Bankruptcy Code is not limiting). For example, bad faith is also "cause" to convert or dismiss a Chapter 13 case pursuant to Section

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89109
(702) 796-5555

G:\DATA\BNKRPTCY\04897.001\pldgs-Dull\10.01\Trial Brief.doc

1  1307(c) of the Bankruptcy Code.  See Leavitt v. Soto (In re Leavitt), 171 F.3d 1219, 1224 (9th

2  Cir. 1999) (citing Eisen v. Curry (In re Eisen), 14 F.3d 469, 470 (9th Cir. 1994) (per curiam));

3  Molitor v. Eidson (In re Molitor), 76 F.3d 218, 220 (8th Cir. 1996).

4       To determine whether bad faith exists sufficient to warrant conversion or dismissal of a

5  Chapter 13 case, courts are guided by the same standards used to evaluate whether a plan has

6  been proposed in bad faith pursuant to Subsection 1325(a)(3) of the Bankruptcy Code.  See

7  Eisen, 14 F.3d at 470.  To determine bad faith warranting conversion or dismissal, a court must

8  review the "totality of the circumstances."  Leavitt, 171 F.3d at 1224; Eisen, 14 F.3d at 470;

9  Goeb v. Heid (In re Goeb), 675 F.2d 1386, 1391 (9th Cir. 1982).

10      A court should consider the following factors in determining whether bad faith exists

11  sufficient to warrant conversion or dismissal of a Chapter 13 case pursuant to Subsection 1307(c)

12  of the Bankruptcy Code:

13          1.    Whether the debtor misrepresented facts in his petition or
14                plan, unfairly manipulated the Bankruptcy Code, or otherwise filed
                  his Chapter 13 petition or plan in an inequitable manner;
15
16          2.    The debtor's history of filings and dismissals;

17          3.    Whether the debtor only intended to defeat state court
                  litigation; and
18
            4.    Whether egregious behavior is present.
19
    Leavitt, 171 F.3d at 1224 (citations omitted).
20
21      A finding of bad faith does not require fraudulent intent by the debtor.  See id. at 1224.

22  "[N]either malice nor actual fraud is required to find a lack of good faith.  The bankruptcy judge

23  is not required to have evidence of debtor illwill directed at creditors, or that debtor was

24  affirmatively attempting to violate the law--malfeasance is not a prerequisite to bad faith."  Id.

25  (quoting In re Powers, 135 B.R. 980, 994 (Bankr. C.D. Cal. 1991)).

25      **2.    Debtors' Case Should Be Converted To Chapter 7 Because It Was Filed In
26             Bad Faith.**

27      Debtors' Chapter 13 case should be converted to Chapter 7 "for cause" because, as has

28  already been set forth above, it was filed in bad faith.  Applying the factors that the Ninth Circuit

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89109
(702) 796-5555

G:\DATA\BNKRPTCY\04897.001\pldgs-Dull\10.01\Trial Brief.doc

15



1  listed in the <u>Leavitt</u> case, Debtors have misrepresented and failed to disclose material facts

2  regarding their financial affairs, and Debtors' bankruptcy filing was clearly to defeat the Arbitration.

3      Conversion of Debtors' case to Chapter 7 now would avoid any further attempts at

4  gamesmanship or delay by Debtors, which would be prejudicial to creditors.  Finally, conversion is

5  "in the best interests of creditors and the estate," pursuant to Subsection 1307(c) of the Bankruptcy

6  Code, because a Chapter 7 Trustee will be able to collect property of the estate and to conduct a

7  thorough investigation of Debtors' affairs.  <u>See, e.g.</u>, <u>In re Eatman</u>, 182 B.R. 386 (Bankr. S.D.N.Y.

8  1995).

9  **IV.**

10  **CONCLUSION**

11      WHEREFORE, TCA respectfully requests that the Court order as follows:

12      (1)    Deny confirmation of Debtors' Chapter 13 Plan;

13      (2)    Convert Debtors' Chapter 13 case to Chapter 7; and

14      (3)    Grant such other and further relief as is just and proper.

15  DATED this 18th day of October, 2001.

16      GORDON & SILVER, LTD.

18  By    _____

19  THOMAS H. FELL, ESQ.
   Nevada Bar No. 3717

20  MATTHEW C. ZIRZOW, ESQ.
   Nevada Bar No. 7222

21  3960 Howard Hughes Pkwy, 9th Fl.
   Las Vegas, Nevada 89109

22  Attorneys for Tamura Corporation of America

GORDON & SILVER, LTD.
ATTORNEYS AT LAW
NINTH FLOOR
3960 HOWARD HUGHES PKWY
LAS VEGAS, NEVADA 89109
(702) 796-5555